# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TOM D. NASSIS,

      Plaintiff,

      v.

LASALLE EXECUTIVE SEARCH, INC.,
TOD McELHANEY,
and BRIAN VIEHLAND,

      Defendants.

Case No. 16-cv-9445

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This case arises from the end of a business relationship between the parties. Plaintiff Tom Nassis, a former recruiter at LaSalle Executive Search (LaSalle), sued Defendants for unpaid wages, alleging violations of: (1) the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*; (2) the Illinois Minimum Wage Law (IMWL), 820 ILCS § 115/1 *et seq.*; and (3) the Chicago Minimum Wage Ordinance (CMWO), Chicago, Ill., Municipal Code § 1-24-010 (2014). [1]. Plaintiff's claims turn upon whether an employer-employee relationship existed between Plaintiff and Defendants, or whether Plaintiff qualified as an independent contractor. Plaintiff moved for summary judgment. [36]. For the reasons explained below, this Court denies Plaintiff's motion.

## I.    Background

### A.    LaSalle Executive Search

LaSalle is a recruiting company that matches job applicants with companies

seeking employees. DSAF ¶ 1.[1] Defendants Tod McElhaney and Brian Viehland own LaSalle but run it as a side project and do not receive compensation from the company. *Id.* ¶¶ 2, 3. LaSalle operates out of an office provided by McElhaney's trading company, LaSalle Futures Group. *Id.* ¶ 6; *see also* [38-4] at 10–12.

LaSalle recruiters earn commissions when they successfully place a candidate with a company. *See* [38-4] at 9, 12. LaSalle and the recruiter split commissions, which cover some of LaSalle's overhead costs. *Id.*; *see also* DSAF ¶ 7. LaSalle does not file unemployment wage reports for its recruiters. *See* DSAF ¶ 7. LaSalle issued IRS 1099 forms for the commission payments it made to recruiters. *See* [42-1] ¶ 3. Though LaSalle pays most of its recruiters on a commission-only basis, Viehland testified that on "a few" occasions LaSalle brought in recruiters on an "employee status." [38-6] at 22.

When Plaintiff worked for LaSalle, LaSalle's recruiters were not entitled to a specific number of vacation or personal days or any health benefits. DSAF ¶ 20; *see also* [38-4] at 36–37; [38-6] at 71–72. Recruiters could create their own titles, but Viehland provided sample language to describe their roles. *See* PSOF ¶ 24; DSAF ¶ 11; [38-6] at 46. LaSalle also provided training documents giving a broad overview of "what recruiting is" to new recruiters. [38-6] at 28, 32. LaSalle gave each of its recruiters access to a phone and computer at its offices, *id.* at 45, as well as Microsoft Office 365 accounts (a cloud-based suite of services including e-mail and other Microsoft applications such as Word), *id.* at 10. Defendants expected

---

[1] "DSAF" refers to Defendants' statement of additional facts, [43], and "PSOF" refers to Plaintiff's statement of undisputed facts, [38]. "R. DSAF" refers to Plaintiff's responses to Defendants' statement of additional facts, [45]. References to additional filings are by docket entry number.

recruiters to secure placements for candidates using those resources and their own initiative and skill. *See id.* at 38; [38-4] at 32. According to Plaintiff, he did some of his own research but also pursued leads provided by Viehland. PSOF ¶ 19. Defendants claim that recruiters did not have to work at LaSalle's offices, *see* [38-4] at 42; DSAF ¶ 20, but Plaintiff declares that he "had to be in the office during normal business hours" each day, PSOF ¶ 20.

### B. This Case

Plaintiff began working as a LaSalle recruiter in the fall of 2015. [38-5] ¶¶ 4–5. Plaintiff, a college graduate, previously spent many years as a proprietary and independent trader in the Chicago Board of Trade (CBOT). *See* [38-9] at 4–5.

Before joining LaSalle, Plaintiff worked as a trader for Kottke Associates. *Id.* at 5–6. Plaintiff did not have a written contract with Kottke. *Id.* at 5. Rather, Plaintiff made trades at the CBOT, which were guaranteed by Kottke. *Id.* at 6–7. Kottke did not pay Plaintiff a salary or hourly wages, did not give him a W-2 form, and did not withhold taxes from his pay. DSAF ¶ 17. Instead, Kottke paid Plaintiff solely based upon his trading profits and losses. *Id.*

Around August 2015, Plaintiff began looking for new employment. [38-9] at 9. A friend connected Plaintiff with McElhaney. *Id.* During an initial meeting around September 2015, Plaintiff expressed interest in McElhaney's trading company—LaSalle Futures Group—but McElhaney told Plaintiff that LaSalle's recruiting work would become a bigger business than McElhaney's futures trading business, which did not then have any openings. *See* [38-4] at 33; [38-9] at 10.

In the following days, Plaintiff exchanged calls and e-mails with Viehland and McElhaney about LaSalle's recruiting business. DSAF ¶ 19. In at least one phone call, McElhaney discussed pay and hours expectations. *See* [38-4] at 36–37. Viehland participated by phone in at least one meeting with Plaintiff and McElhaney in early September 2015. [38-6] at 28. Following that phone call, on September 11, Viehland e-mailed Plaintiff written materials about the recruiting business generally and about LaSalle's policies and procedures. *See id.*; *see also* DSAF ¶ 23. LaSalle's incoming recruiters did not typically sign written agreements before beginning their work at the firm. [38-4] at 11, 12. Defendants assert that Plaintiff did not sign an employment agreement and the record contains no evidence suggesting otherwise. *See* R. DSAF ¶ 20.

Between September and October 2015, Viehland sent numerous training documents to Plaintiff, including introductory manuals, scripts for recruiting calls, and other training books to familiarize Plaintiff with successful recruiting practices. *See* [38-6] at 28, 30–35; DSAF ¶ 23; [38-5] ¶ 14. LaSalle also bought Plaintiff a Kindle to use to review his training materials, scripts, and other resources. *See* [38-6] at 33, 45. Plaintiff read many of these materials and also pursued "independent learning opportunities" outside of those materials, which he incorporated into his eventual recruiting efforts. DSAF ¶¶ 24, 28.

Defendants say that Plaintiff began working for them around late October 2015, [38-3] ¶ 17, and McElhaney set up a workstation at LaSalle's offices for Plaintiff on November 2, [38-6] at 109. On or about that date, Plaintiff wrote in his

personal journal that he "was mentally prepared to receive little or no direction" from McElhaney and others at LaSalle. [38-9] at 48–49.

Plaintiff knew that he would be paid on straight commission for the job placements he made. R. DSAF ¶ 29. Plaintiff asserts that although he understood his compensation would come from recruitment commissions, other LaSalle recruiters were not paid on a straight commission basis. PSOF ¶ 57. The commission itself was generally set according to a standard contract between LaSalle and the company with whom a candidate was placed. *Id.* ¶ 30. Recruiters could negotiate to alter the terms of the fee agreement with the company, but some changes required approval from McElhaney or Viehland. *Id.*; [38-6] at 68. On occasion, recruiters used fee agreements provided by the company. [38-6] at 21.

Plaintiff worked sporadically in LaSalle's offices during the final two months of 2015, but the record contains conflicting testimony as to whether he also worked from home during that time. *See* [38-4] at 42; [38-6] at 41, 71; [42-1] ¶ 9. Plaintiff declares that he worked "exclusively" and "full-time" for LaSalle from November 2015 to early May 2016. PSOF ¶ 51. Defendants allege that Plaintiff did not work full-time, often leaving LaSalle's offices around 2:00 p.m. DSAF ¶ 33. Plaintiff declares that his regular practice was to leave work around 5:00 p.m. [45-1] ¶ 3. LaSalle's building security required employees to swipe into the building, but not out; their records show that Plaintiff typically arrived around 8:50 a.m. on days he worked on-site. *See* [38-6] at 175–81.

As part of his training, Plaintiff shadowed Abel Lopez, a fellow recruiter, in

early November 2015. [42-1] ¶¶ 9–11. Lopez began with LaSalle in 2013 but took time off periodically for side projects. *Id*. ¶ 2. Although Lopez explained the importance of spending at least two hours per day on the phone to be successful making job placements, Lopez stated in his affidavit that, by January 2016, Plaintiff still did not seem comfortable on the phone and spent "more time reading and sending emails." [42-1] ¶ 11. Plaintiff understood that it was important to make as many calls as he could each day from his training with Lopez, training documents, and conversations with Viehland. [38-9] at 45–46. Another recruiter, Dan Prinn, worked at LaSalle at the same time and in a similar role as Plaintiff. PSOF ¶ 58. The parties agree that Prinn also received a percentage of recruiting fees and "did not do any recruiting work" that differed "in any way" from other LaSalle recruiters. *Id*.; *see also* R. PSOF ¶ 58.

Defendants contend that they did not control recruiters' day-to-day schedules or tasks. DSAF ¶¶ 10, 30; *see also* [38-4] at 19; [38-6] at 72–73. Plaintiff asserts that he "had to be in the office" in normal business hours, and that recruiters were expected to put in "3–4 hours of phone time daily." *See* PSOF ¶ 21. The parties agree that in November and December 2015, Plaintiff took time off to visit with his brother, but dispute the nature of his leave. *See, e.g.*, DSAF ¶ 33; R. DSAF ¶ 33.

Defendants acknowledge that they provided guidance to recruiters, including the training materials and resources discussed above. *See* DSAF ¶ 23. They also answered questions, resolved disputes among recruiters, and provided feedback and approval for the recruiters' fee arrangements with the companies they recruited for.

*See* [38-6] at 42–44; 57–58; 68; PSOF ¶¶ 22–23, 30–31. On some occasions, Viehland provided Plaintiff with "leads" on available openings for job candidates. [38-6] at 54; PSOF ¶ 19. Viehland also played some role in dividing up work among recruiters: in December 2015, he sent the recruiters an email about who was responsible for which candidates and companies, in part to resolve any disputes among recruiters if their work overlapped. *See* PSOF ¶ 27; [38-6] at 51–52.

In January 2016, Viehland introduced LaSalle's recruiters, including Plaintiff, to Big Biller, a website that combined contact management and applicant tracking in one piece of software that recruiters could access remotely. *Id*. at 124–27. In an email to recruiters notifying them about LaSalle's implementation of this software, Viehland told the recruiters that watching the accompanying training video was "mandatory" and offered to "field any questions." [38-6] at 124.

Around February 2016, Viehland created a daily "goal sheet" to track individual recruiters' expectations for themselves and their progress toward those goals. *Id*. at 55. Plaintiff completed goal sheets from March to April 2016 and sent them to Viehland. *See id*. at 128–68. Though Viehland sometimes reviewed these submissions, he never used them as a performance evaluation tool. *Id*. at 56–57. McElhaney testified that the goals sheets were "for the recruiter's benefit" rather than for Defendants'. [38-4] at 30. Although Plaintiff submitted a number of goal sheets, he did not receive feedback on them. *See* DSAF ¶ 34; R. DSAF ¶ 34.

In early 2016, LaSalle Staffing, a different recruiting company, sued LaSalle for trademark infringement and related claims. DSAF ¶ 37; PSOF ¶ 59.

Defendants had received letters from LaSalle Staffing addressed to Plaintiff and Prinn around February or March 2016. *See* [38-4] at 92–98; PSOF ¶¶ 59–61. McElhaney received the letters and referred them to his attorney, but did not notify Plaintiff that he had received a legal communication addressed to Plaintiff until LaSalle Staffing filed its suit. *See* [38-4] at 97–98; PSOF ¶¶ 60–61. LaSalle Staffing named Plaintiff individually as a defendant and Plaintiff was ordered to appear in Cook County Circuit Court on May 2, 2016. [38-4] at 102. McElhaney signed an affidavit attached to a motion to strike in the LaSalle Staffing lawsuit, stating that "Tom Nassis is an employee" of LaSalle, and also identifying Prinn as a LaSalle employee. PSOF ¶ 64.

Shortly after Plaintiff found out about the LaSalle Staffing case, he stopped working for Defendants, though the parties dispute precisely how their employment relationship ended. *See* DSAF ¶ 40; R. DSAF ¶ 40; [38-9] at 61. Plaintiff admits that during his tenure at LaSalle he never made a job placement. R. DSAF ¶ 35. He also acknowledges that he worked for LaSalle solely on a commission basis. PSOF ¶ 16; *see also* [38-9] at 69–70.

Plaintiff sued Defendants in October 2016. [1]. Plaintiff now seeks summary judgment on all counts of his complaint. [36].

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When addressing a motion for summary judgment, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party must identify the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more" than show "some metaphysical doubt as to the material facts." *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-moving party's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

III.    **Analysis**

Plaintiff alleges that Defendants violated the FLSA, the IMWL, and the CMWO by failing to pay him for any work he did on behalf of LaSalle. [1]. Broadly, Plaintiff argues that those statutes protect him because he qualified as an "employee" under state and federal law while working for LaSalle, and each Defendant constituted an "employer." *Id.* Plaintiff seeks summary judgment on all claims. [36]. This Court addresses each in turn.

## A.    FLSA Claim

This Court must determine whether Plaintiff's claims fall under the FLSA by examining: (1) whether LaSalle is an "enterprise engaged in commerce"; and (2) whether the "economic reality" of the relationship between Plaintiff and Defendants constituted an "employment relationship." *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987); *see also Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1074 (N.D. Ill. 2014). The FLSA's definitions are "broad and comprehensive in order to accomplish the remedial purposes of the Act." *Lauritzen*, 835 at 1534 (citing *United States v. Rosenwasser*, 323 U.S. 360, 362–63 (1945)). Under the Act, covered employers must pay a set minimum wage to all employees. *See* 29 U.S.C. § 206(a); *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 290 (7th Cir. 2016).

Whether a worker qualifies as an employee depends upon "the totality of circumstances rather than on any technical label," and requires a "flexible" approach. *Id.*; *see also Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). Although the determination of employer and employee status are questions of law, *see Lauritzen*, 835 F.2d at 1535; *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784–85 (N.D. Ill. 2011), disputes over the material underlying facts may preclude summary judgment, *see Villareal*, 776 F. Supp. 2d at 787.

The parties do not dispute that LaSalle is an enterprise engaged in commerce, *see generally* [37]; [41]; *see also* [38-4] at 16, and this Court proceeds to analyze the parties' employment relationship.

10

### 1. Viehland and McElhaney as "Employers"

Under the FLSA, "any person acting directly or indirectly in the interest of an employer in relation to an employee" constitutes an "employer." 29 U.S.C. § 203(d). Whether an individual qualifies as an employer depends upon the "economic reality" of the situation rather than on "formalistic labels or common law concepts of agency." *Perez*, 55 F. Supp. 3d at 1075; *see also Lauritzen*, 835 F.2d at 1534. Courts applying the economic reality test assess various factors, including whether the employer: "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Nehmelman v. Penn Nat'l Gaming, Inc.*, 790 F. Supp. 2d 787, 795 (N.D. Ill. 2011).

With respect to the first factor, Viehland and McElhaney co-own LaSalle. DSAF ¶ 2. Defendants hired a handful of workers after founding LaSalle, and hired Plaintiff. *See* [38-4] at 8–9, 11; PSOF ¶ 13 ("McElhaney and Viehland made the decision to retain Plaintiff's services . . ."). The record does not establish whether Defendants ever fired a recruiter. Plaintiff's testimony indicates that he ended his business relationship with Defendants, although the circumstances remain nebulous. *See* [38-9] at 31. This sparse and imprecise record somewhat supports finding that Defendants qualified as employers, but the factual disputes prevent this factor from weighing heavily one way or another. *See Villareal*, 776 F. Supp. 2d at 786–87 (denying summary judgment on employer status in light of conflicting and disputed evidence); *cf. Solis v. Int'l Detective & Protective Serv. Ltd.*, 819 F.

Supp. 2d 740, 749 (N.D. Ill. 2011) (undisputed facts showing that alleged employer oversaw hiring and firing supported finding employer status).

As to the supervision and control factor, the record shows that Defendants generally did not directly manage the recruiters' work. *See* [38-6] at 102–03, 105, 107; [42-1] ¶¶ 6–8. Defendants did not oversee or manage Plaintiff's hours beyond telling Plaintiff that he should spend significant time making phone calls to succeed in his work. *See* DSAF ¶ 20; PSOF ¶ 21; [38-9] at 37–38; *cf. Perez*, 55 F. Supp. at 1076 (employer tracked hours spent performing specific tasks). Other recruiters, such as Lopez, set their own hours, and Defendants did not require notice or pre-approval for extended absences. *See* [42-1] ¶ 5; DSAF ¶ 20; c*f. Harris v. Skokie Maid & Cleaning Servs., Ltd.*, No. 11-c-8688, 2013 WL 3506149, at *5 (N.D. Ill. July 11, 2013) (finding employer status where defendant determined employee schedules, among other supervisory tasks). On the other hand, Viehland and McElhaney offered guidance on specific recruiting issues, indicated specific software that recruiters should use, and provided some amount of supervision over recruiters' fee agreements. *See, e.g.*, [38-6] at 21–22, 124–27; DSAF ¶ 23; PSOF ¶¶ 22–23. Overall, this factor remains open to competing inferences.

With respect to the payment factor, LaSalle paid recruiters based upon commissions for successful job placements. [42-1] ¶ 3; [38-4] at 18. While LaSalle determined the commission-payment structure, recruiters had some discretion as to the amount of commission they could charge companies for whom they recruited employees. *See* [38-6] at 20; *cf. Perez*, 55 F. Supp. at 1076–77 (employer exercised

direct control over payment, including "discipline-related pay deductions" and calculating payment due). Recruiters could discuss fee arrangements with Defendants and seek advice on commissions, but Defendants did not set a mandatory minimum for commissions. *See* [38-6] at 20–22. Indeed, LaSalle recruiters sometimes used form agreements provided by LaSalle, and sometimes agreements provided by the companies with whom they placed applicants. *See id*. That said, fee agreements had to be signed by LaSalle, rather than the individual recruiter, and certain deviations from LaSalle's standard agreement had to be pre-approved by Viehland or McElhaney. *See* PSOF ¶¶ 30–31.

In short, Defendants established the method of payment—commissions—but provided only minimal or occasional supervision over the rate. This tends to favor employer status, but Defendants' lack of direct involvement with recruiters' fee arrangements cuts the other way. *Compare, e.g.*, *Solis*, 819 F. Supp. 2d at 749 (overseeing compensation supported finding employer status), *with Schneider v. Cornerstone Pints, Inc.*, 148 F. Supp. 3d 690, 698–99 (N.D. Ill. 2015) (nominal owners of corporation were not employers where they did not supervise or even know details of employee payment).

As to the employment-records factor, the only employment documentation noted in the record are the IRS 1099 forms that Defendants provided for payments to recruiters and the "goal sheets" instituted in January 2016. *See* [42-1] ¶ 3; [38-6] at 55. Viehland and McElhaney testified that the sheets assisted recruiters in self-management instead of helping LaSalle track or assess its recruiters' work. *See*

[38-4] at 30; [38-6] at 56–57. LaSalle did not track recruiters' hours. *See* DSAF ¶ 20; [38-6] at 36; [38-4] at 43.

Overall, determining the nature of Defendants' working relationship with Plaintiff would require this Court to weigh evidence, assess the parties' credibility, and select which inferences to draw from the facts—these are not tasks for the district court at summary judgment, but for a factfinder at trial. *See Villareal*, 776 F. Supp. 2d at 787; *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, genuine issues of material fact preclude summary judgment on whether Defendants qualified as Plaintiff's "employers" under the FLSA. *See Anderson*, 477 U.S. at 248, 252.

### 2. Nassis as an "Employee"

The FLSA defines "employee" liberally. *See Rosenwasser*, 323 U.S. at 362 ("A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame."); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). But the FLSA's definition "does have its limits." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985); *see also Berger*, 843 F.3d at 290. An "individual who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit" falls outside FLSA coverage. *Tony & Susan Alamo Found.*, 471 U.S. at 295 (internal quotation marks omitted).

To qualify as an employee, the economic reality must reflect that Plaintiff was "actually dependent upon" LaSalle. *Perez*, 55 F. Supp. at 1076. Relevant

factors include: (1) the nature and degree of Defendant's control of the manner in which Plaintiff performed his work; (2) Plaintiff's opportunity for profit or loss depending upon his "managerial skill"; (3) Plaintiff's own investment in equipment or materials required for his work; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an "integral part" of the alleged employer's business. *See id.*; *see also Lauritzen*, 835 F.2d at 1534–35. No single factor is dispositive, but dependence upon the employer remains an underlying consideration. *See Lauritzen*, 835 F.2d at 1534.

Plaintiff urges this Court to follow the Seventh Circuit's reasoning in *Schultz v. Cadillac Assocs., Inc.*, 413 F.2d 1215 (7th Cir. 1969), in which the court found that "employment counsellors" qualified as employees because they "depended upon" their alleged employer for "training, direction and compensation," *id.* at 1217. Although the counsellors' compensation depended upon the number of job placements they made, the scheme "was set by defendants" and resembled "piecework more than an enterprise resting on the initiative, judgment or foresight of the typical independent contractor." *Id.* Accordingly, the counsellors could qualify as employees. *Id.*

Although some facts in *Schultz* resemble those presented here, the parties in that case presented a well-developed record, including evidence that the alleged employer created and maintained employment records, filed quarterly wage reports to the state, furnished W-2s, and established a hierarchy in which senior

counsellors oversaw the work of their more junior colleagues. *See id.* Here, the record's many disputed material facts prevent summary judgment, as shown by the foregoing discussions, as well as a brief consideration of the factors listed above— each of which remains subject to factual disputes.

### i. Control

An "employer's dominance over the 'manner and method' of how work is performed" provides evidence of control evincing an employee-employer relationship. *Perez*, 55 F. Supp. 3d at 1076. In *Lauritzen*, the Seventh Circuit identified factors demonstrating the requisite control, including: (1) actual supervision; (2) ability to set hours; (3) the workers' subjective belief of their supervisor's power to control; and (4) the supervisors' control over "the operation as a whole." 835 F.2d at 1536.

Here, Defendants exercised some supervision over Plaintiff's work, including requesting that recruiters use specific software and submit daily goal sheets. *See* [38-6] at 55, 124–27. But McElhaney and Viehland both testified that they did not use the goals sheets to track or manage recruiters' performance. [38-6] at 56–57; [38-4] at 30. As noted above, Defendants generally did not directly oversee the recruiters' work. *See* DSAF ¶ 20; PSOF ¶ 22; [42-1] ¶¶ 6–8. These facts weigh against finding that Defendants "controlled" Plaintiff's work.

On the other hand, Plaintiff testified to his belief that Viehland and McElhaney exercised significant control over LaSalle's recruiters—either directly or through more senior recruiters like Lopez—and described the ways in which

Defendants provided guidance on recruiting practices. [38-9] at 23–24, 26; *see also* PSOF ¶¶ 20–23. And the parties agree that Viehland and McElhaney own and operate LaSalle in a manner that appears to reflect loose supervision but significant authority. *See* DSAF ¶¶ 2, 3; [38-4] at 8–9, 11; PSOF ¶ 13. Finally, Defendants provided Plaintiff with scripts and other training materials, thus controlling in some respects the manner in which Plaintiff carried out his recruiting work. *See* [38-6] at 28, 30–35; PSOF ¶¶ 26, 49; *Perez*, 55 F. Supp. 3d at 1076–77. The parties dispute how much freedom recruiters had to set their own hours or take time off at will. *Compare* [38-4] at 19; [42-1] ¶¶ 2, 5, *with* PSOF ¶¶ 20–21; R. DSAF ¶ 33.

In sum, the record contains conflicting evidence about the degree of control exercised by Defendants.

### ii.    Opportunity for Profit and Loss

Independent contractors risk "loss of their investment" and possess "the opportunity to increase profits through managerial discretion." *Perez*, 55 F. Supp. 3d at 1077; *see also Lauritzen*, 835 F.2d at 1536. Situations that do not allow workers to adjust their own hours, work more efficiently, or exercise significant "managerial discretion" weigh in favor of employee status. *Perez*, 55 F. Supp. 3d at 1077. Here, recruiters could increase their profits by securing more job placements, which favors independent contractor status. *See id.* at 1077. On the other hand, they worked within an overall scheme set by Defendants, and performed the fairly straightforward task of seeking job placements using materials and guidance provided by Defendants. As shown by the discussions above, the parties dispute the

extent to which Defendants controlled, supervised, or established the manner and method of Plaintiff's work, and it remains possible that Plaintiff did not exercise the independent "judgment or foresight" characteristic of independent contractors. *See Schultz*, 413 F.2d at 1217. If so, Plaintiff might still qualify as an employee. *See id.*

### iii.  Special Skill

Highly specialized job skills may indicate independent contractor status, although they "are not the monopoly of independent contractors." *Lauritzen*, 835 F.2d at 1537. The level of specialization and its relevance to the employee inquiry depends upon the facts of the case. *See, e.g.*, *Perez*, 55 F. Supp. 3d at 1077–78 (maids' work including various cleaning tasks did not demonstrate independent contractor status); *Solis*, 819 F. Supp. 2d at 752 (N.D. Ill. 2011) (security guard's training in firearms operation did not show independent contractor status where the bulk of the guards' work in patrolling property did not require specialized skill). Receiving training does not necessarily show that a job requires specialized skills. *See Perez*, 55 F. Supp. 3d at 1078. "Specialized training" may do so, but merely acquiring basic "occupational skills" usually does not. *Solis*, 819 F. Supp. 2d at 752.

Here, the parties agree that recruiting work is essentially that of a "salesperson," *see* [37] at 10; [38-4] at 32, but they disagree as to whether skill in sales qualifies as a specialized skillset, *see* [38-6] at 36; [38-9] at 13–14. The sparse record on the day-to-day responsibilities of LaSalle recruiters does not clarify the situation. Although reliance upon training materials may indicate some specialized skill, the record also indicates that Plaintiff's job mainly involved making phone

calls to connect job applicants with potential employers, which is not particularly technical or specialized. *See Solis*, 819 F. Supp. 2d at 752. The fact that Plaintiff could essentially walk onto the job—with some rudimentary training—after working in a different industry suggests that recruiting was not a highly specialized skill. *See id.*; *see also Lauritzen*, 835 F.2d at 1537. Thus, this factor favors employee status, but remains open to differing inferences.

### iv. Permanence of the Working Relationship

A permanent working relationship generally demonstrates employee status. *See Lauritzen*, 835 F.2d at 1537. Here, recruiters did not sign contracts with LaSalle, and McElhaney testified that LaSalle's relationship with its recruiters was "indefinite." [38-4] at 29; R. DSAF ¶ 20. The record shows that some LaSalle recruiters retained other jobs and could leave and return to LaSalle when convenient. *See* [42-1] ¶¶ 1–2; [38-4] at 12, 42. The significant dispute over how and when the parties' business relationship ended further reflects the fluidity of LaSalle's business practices. *See* DSAF ¶40; R. DSAF ¶ 40; [38-9] at 61. Although this factor tends to favor independent contractor status, the lack of clarity about the nature of the "indefinite" relationships, as well as the lack of evidence about whether Plaintiff himself held a temporary or (theoretically) permanent position, means that this factor, too, remains subject to competing interpretations.

### v. Summary

This Court need not continue to set out each factual issue precluding resolution of the remaining factors. Suffice it to say that the numerous factual

disputes evident throughout the record and the foregoing analysis prevent summary judgment. *See Anderson*, 477 U.S. at 248, 252. When the record at summary judgment remains relatively undeveloped or would require the court to "weigh conflicting testimony" or evidence, judgment as a matter of law is inappropriate. *See Villareal*, 776 F. Supp. 2d at 787; *see also Payne*, 337 F.3d at 770. Such is the case here. This Court denies Plaintiff's motion for summary judgment as to his FLSA claim.

### B.    IMWL Claim

The IMWL and FLSA are similar in scope and courts employ the same analysis to determine whether an employment relationship exists. *See, e.g. Natal v. Medistar, Inc.*, 221 F. Supp. 3d 999, 1003 (N.D. Ill. 2016); *Haynes v. Tru–Green Corp.*, 507 N.E.2d 945, 951 (Ill. App. Ct. 1987). Accordingly, genuine issues of material fact prevent summary judgment on Plaintiff's IMWL claim. *See Anderson*, 477 U.S. at 248, 252.

### C.    CMWO Claim

The definition of "employee" under the CMWO is coterminous with the IMWL, with the added condition that the employee "performs at least two hours of work for an Employer while physically present" in Chicago. § 1-24-010. Because this claim follows the same analysis as Plaintiff's other claims, genuine issues of material fact preclude summary judgment on this claim as well. *See Anderson*, 477 U.S. at 248, 252.

## IV.  Conclusion

For these reasons, this Court denies Plaintiff's motion for summary judgment

[36].

Dated:  April 30, 2018

Entered:

John Robert Blakey
United States District Judge